Good morning Judge Noonan. My name is Gene Barabio. I'm here on behalf of Mr. Hernandez. Your Honor, in terms of the issue of whether or not there was probable cause to arrest my client at 1130 when the police first detained him, actually I wasn't planning to say all that much. I'd be happy to address whatever questions the court might have about that. But I think that's an issue that the court can easily deal with on the briefs. The district court found that there was no probable cause after 1130. There wasn't a probable cause after they learned of what the other suspect told them. Talk to your man about the drugs. I'm sorry, Judge Noonan, would you mind repeating your question please? I think he's talking about that the co-defendant fingered your defendant. Right, but that's at the other end of the incident, so to speak. I think once he says talk to this guy about the drugs, maybe. I'm not expressly conceding that, but I think I would have a harder argument that at that point there was a probable cause. So let's assume that, and then the interrogation is after that, is it not? Yes, Your Honor. So, doesn't that break the chain, or whatever you want to say? Well, I don't believe that it does, Your Honor. Your Honor is referring to the manual case which the government cited in the answering brief. First of all, the evidence there, the independent evidence of the suspect's guilt was considerably stronger than what the government confronted my client with. What are we trying to find out? I'm not sure why that matters. I mean, what we're trying to find out, as I understand it, is whether the earlier, and let us assume a legal arrest. He was basically for seven hours he was in handcuffs and shackles and allowed to drink water but not eat. Right. And sitting there. The question is, I mean, the sort of conceptual ultimate question is, did that have an impact on the fact that after he was Mirandized, right? Right. That he gave a confession. So what does the strength of the evidence have to do with that? Well, what it has to do with is whether or not the evidence against the client is so strong that you can say that regardless of how bad the arrest was, the fact that he's confronted with incontrovertible proof of his guilt, well, you know, he decided to, I suppose, clear his consciences. What the court is trying to find out, if the facts show that he confessed for some reason. It's not really what the facts are. It's what he knew they knew. That's a little different point. Well, I suppose. I mean, I don't know whether that statement really is different from what I'm saying. Maybe I'm missing that distinction. The point is, the ultimate question the court is trying to answer there is, can you say that this, I suppose, confrontation with additional evidence is such an event that it's sort of, you can infer that the confession was a product of the client's free will as opposed to as a result of the fact that he's been just, you know, essentially arrested and kept sitting on trial. So it's not a causation inquiry. I mean, on one level, if he hadn't been detained, he wouldn't be there and he wouldn't have given the confession. But that's not the question. Right. Is that right? Well, right. No, I don't think that's the question. It's not a but-for type of an analysis. Again, the question, in fact, I reread both Wong-Sun and Brown v. Illinois this morning. And the ultimate question is whether or not you can say that this new event breaks the chain in such a way that you can say that the confession is a result of the client's free will. He decided to confess versus he was still affected by the fact that he was just kept under arrest without food for seven hours. I don't understand the whole structure here because he was Miranda. So as far as the custody is concerned, at least we generally think that even if someone's in custody, if you're given a Miranda warning and you confess that you're ‑‑ if you voluntarily waive your Miranda rights in absence of unusual circumstances, you're voluntary. So what is the fact that before that, for seven hours, he was illegally arrested have to do with voluntariness? It doesn't seem to have to do with voluntariness. It should have something more to do with some social action. Well, I think ‑‑ and I think this is the last word you just uttered. I think that's sort of the crux of the matter. It's not ‑‑ you're not trying to vindicate Fifth Amendment rights in this analysis. You're trying to protect Fourth Amendment rights. What the court is doing is making sure that the police does not profit from Fourth Amendment violation. By then, let's say, okay, we violate the suspect's rights with impunity. Then we give him Miranda and, you know, that's a cleaning act. We can do whatever we want. But on one level, of course, they did that because he wouldn't have been there. Right. But, in fact, I guess I would direct the court to Brown v. Illinois because that's precisely the question the court addressed there. Because there, the Illinois state courts sort of adopted the same analysis that I think Your Honor is talking about. They basically said, well, you know, he was given Miranda and that's sort of a factor which we're going to use to say that we're not going to exclude the evidence. And the Supreme Court said no. Miranda takes care of the Fifth Amendment violation. But the prophylactic nature of the exclusionary rule is in the protection of the Fourth Amendment rights. And you make sure that you don't allow the police to profit from the Fourth Amendment violation that just took place. And you look to see whether the confession that resulted is a product of the illegal arrest or some intervening act that sort of would show you that the confession was a sort of act of a free will. And, for example, in the ---- It's kind of an inevitable discovery sort of inquiry. Well, I'm not sure how inevitable. Perhaps Your Honor could expand on this because I'm not sure. Well, that he would eventually have been given his Miranda rights and confessed, you know, anyway. So what's the difference? Well, no. Well, the difference is that when you ---- let's take the fact of this case. You're dealing with somebody who doesn't speak English. He's arrested. He's handcuffed. He's kept on the street for seven hours. Not fed. He's given water, to be fair. And he's taken to the bathroom. But he's essentially arrested for seven hours. And then the police, you know, he's surrounded by people speaking English. As far as based on my interactions with Mr. Hernandez, he doesn't speak any English. And I think that's an additional factor in terms of setting the scene. Well, but also part of the scene, too, has to be the fact that they observed your client walk up to the house without knocking, water the lawn for 45 minutes in what they determined to be a suspicious manner, looking up and down the street, walk back into the house without knocking. A neighbor said your client was there all the time. A substantial amount of drugs were found on the premises. And your client was evasive with some basic questions. So they should have let him go? No. I'm not saying that. Well, first of all, just to clear up the facts, the drugs were found in the garage. Nobody sees him enter the garage. They do see him enter the house. But the point was they detained him. Well, but I guess, you know, the thing is it would have been a different case if he had knocked on the door or anything like that. The guy walked in, didn't have to use the key, walked in and out. And that certainly is – I'll concede that he has some familiarity with the house. I'm not disputing that they could have detained him at 1130 for a tariff stop to figure out what his connection to the house might be. But when you – But then things kind of get worse as it progresses for him. And then ultimately, then besides the fact, you know, then they find drugs, then the other person that's there points the finger at you. You know, I don't see how the officers, you know, could have done – if they had let him go, that would be pretty stupid. Well, again, I'm not disputing that they could run an investigation. I mean, they had enough for a tariff stop to try to figure out what his connection to the house is. But they don't do a tariff stop. In fact, I don't agree that – So when should they have let him go? Is your – do you think they should have just let him go at some point? Well, I mean, you're asking me to address a hypothetical that would assume that they've attempted some investigation and come up with something or don't come up with something. So it's hard to – I mean, I don't know if there is a bright line where I can say in two hours he's out. Or, you know, in 45 minutes he's out. You know, it's always a case-by-case analysis. But my point is, if you keep somebody in the state that they kept him for seven hours, that's not a tariff stop. They're not investigating. In fact, when they detain him, you know, at the suppression hearing, they testify, we detain him specifically to figure out whether the search would help us develop a case against him. We want to see if something turns up that could connect him to the residence. So it's not a tariff stop. It's an arrest. What were the facts of the Manuel case, which is being relied on? It wasn't one key fact that the actual confession was the next day? Well, it was – yeah, I mean, I think that's one of the factors, that it was a significant passage of time. I think this was a case where the police were looking for a murder suspect, and the suspect they arrested – I guess they may have arrested him prematurely, before they really had enough evidence to arrest him. But from the time that they arrested him, they let him sleep overnight, they feed him, and they questioned him in the morning. I think the arrest took place at night. The police don't talk to him until like 8 o'clock the next morning. At that point, they have two eyewitnesses who see the suspect, sort of attack the victim.  And that's why I said that, first of all, on the strength of the evidence, that the independent evidence in Manuel was considerably stronger than what you have here. And you do – Judge Berzon, you're correct. The passage of time there, you know, the passage of time is one of the factors in deciding if sort of the illegality of the arrest was attenuated. A lot more time passed in that case than in this case. Because he was questioned here in the first statement, right when he was still handcuffed and during the initial ordeal. And the second statement that he gave was like 20 minutes after the first statement. By that point, you can tell from the transcript of the second statement that sort of his incentive to not incriminate himself was overborne, because he saw the first statement was coming in. And again, this is right out of Brown, I believe. If you have a second statement that's right on top of the first one and the suspect thinks that the first one is coming in, the court interprets that as evidence that his will sort of not to self-incriminate was overborne. Okay. You're out of time. Thank you very much. Thank you for your useful argument. Mr. Yohalam again. Good morning again, Your Honors. May it please the Court, Mark Yohalam on behalf of the United States. I want to start very quickly with the probable cause issue. I think Judge Callahan basically got most of the facts out, so I'm not going to repeat it. So when did they have probable cause to arrest? Was there a detention prior to probable cause? Why or why not? And what was the basis of the initial detention? So what do we do with all that? Okay. I think there was probable cause, frankly, in the morning from the 8.30 to 9.30 period when defendant is acting as a lookout. Even at that point, there would have been probable cause. Sorry. After they discovered the drugs in the garage, there would, at that point, be probable cause to arrest defendant. And there they have – Really? I can tell that Judge Corzine is skeptical of that, but I wanted to – What do we know at that point? I mean – We know that – That he has something to do with the house in which there's drugs. There's probable cause to believe there's drugs in the house. Everyone agrees with that. Their defendant went into the house for at least 10 minutes – But actually, at that point, there was drugs in the garage. He didn't go into the garage. That's correct, Your Honor. But everyone agrees there's probable cause to believe there are drugs in the house. That's where the warrant comes from. I don't think defendant disagrees that there's probable cause to believe there's drugs. Once it's found in the garage. Yes, Your Honor. But it wasn't found in the garage at the time they first saw him in the – Right. Your Honor, I'm saying after they find the drugs. I'm aware the defendant has left at that point. Okay. But at that point, they would be able to address it. All right. He's left. Then one of the facts I found really odd was that he then comes back. There are police all over the place. And he walks right into the house or tries to. And your brief says that's evidence that – of suspiciousness. It seems to me to be the opposite. I disagree, Your Honor. And I would direct the Court to the Lomas case. I actually think the Lomas case here is very, very close to this case. There's a slight oddity about Lomas, which is that the Ninth Circuit at that time treated probable cause as a factual finding reviewed for clear error. So it's a little bit different legally. But there you have cops are watching a bank, and you have two defendants. And this is what the defendants do. The cops believe that there's this white Mustang that's going to be used as a getaway car in the bank robbery. They see two defendants, Lomas and Margolis, on separate occasions, each walked over to the Mustang and looked inside. So that's equivalent to defendant going up to the house. In addition, Margolis approached a DEA car in which an agent was seen and glanced through a back window. Finally, Lomas was seen standing on a corner looking over the top of a newspaper in the direction of the bank. On that, the Court found there was probable cause to arrest. Do we have any reason to think, and I don't remember, that those people were in uniform, that he knew that that was a police car? It was a DEA car with a radio signal. And in fact, the evidence, the argument there was that Margolis was looking for a radio in the dashboard of an unmarked DEA vehicle. Unmarked. There you go. Unmarked. To determine if the person inside was a police officer. In other words, he was looking to see what law enforcement was doing there. I think here there's a fair inference. It just seems so obvious that if somebody thought he had a problem with drugs in a house and saw a bunch of policemen in front of the house, he wouldn't want to be associated with the house. He'd want to be somewhere else. Your Honor, I think sometimes lawyers make a mistake because of assuming defendants are as smart and rational as the lawyers who represent them. I'm not saying that it counts that way. I'm just saying that to count it in favor of the notion that this is suspicious seems extremely strange. It seems to me that some perfectly innocent person would be at least as likely, if not more likely, to say, well, why do I care if there are police in the house? I don't have anything to do with it. I'm just going to the house because that's where I'm going. Or you could go in where they're not looking and hide Mordeaux. I guess I just here we have the officers saying based on their training and experience, which is training and experience that we don't have, and training and experience which this Court has said that some deference is owed to, saying it's suspicious. We, in fact, know in hindsight, we know the defendant was associated with the drug.  Well, let me ask you something. Suppose he had turned around and knocked on the house. Certainly that would have been suspicious. I think it would have depended on how he behaved. Well, you don't think they would have come in and said that was suspicious? I think it would have depended on how he behaved. I mean, I think here, Your Honor, it's not nearly the approaching the house, though. It's going up and then the series of preposterous lies of I don't know where I live, I don't know where I live. But that was all after he was detained, wasn't it? It was after Terry stopped, Your Honor. At that point, I don't see how he can be said to be unarmed. He wasn't already handcuffed at that point? He was handcuffed, Your Honor, but handcuffing does not convert a Terry stop into an arrest. And here I would direct the Court to the Bautista case, 684 F. 2nd, 1286. In Bautista, it says where there is a crime that suggests there may be a risk of violence. Absolutely the case with guns and drugs. And the defendant is looking nervous and suspicious, like perhaps he might run. Here we have a defendant who is looking nervous. That officers are allowed to handcuff him and not convert it into an arrest. Let me ask you something. Suppose we didn't think there was probable cause at that point. Then what? Then we get to this later seven-year or seven-hour later point. Then what? Your Honor, no probable cause at which point? At any point before the co-defendant. Okay. So then I think there, there is clearly the taint is attenuated. And, in fact, I'm not even sure that we need to. There's clearly what? I want to hear you. The taint is attenuated. But I'm actually not sure we even reach the question of the taint is attenuated because I don't think his confessions are, in fact, a fruit of the poisonous tree. Under the Crawford case from this Court, there's no question of attenuation until the connection between the primary illegality and the evidence of taint is established. Now, here, something that I think is incredibly significant is that there is nothing that happens differently in this case based on defendant showing up and being detained. That is, imagine if instead of defendant showing up at 1130, as he does in the facts of this case, he shows up instead at 6 o'clock right as they're asking Soltero, what about these drugs? Everything would have played out exactly the same. There's nothing in the record to suggest otherwise. I know defendant is now making this argument that he was so exhausted and deprived. And I just note that he was offered food. He just declined it. But there's nothing in the record that shows that he was, in fact, his will was overborne. The only significance is that he happened to be at that point in time. But that is not the causal fact of what ends up happening. Well, that doesn't seem – I mean, this is very strange state of law, which I haven't really thought very hard about before. But if you look at Brown, the – it does seem – I mean, Brown is trying to balance off, as I understand it, a per se rule in one direction and a per se rule in the other direction, i.e., the Miranda warnings are not themselves – solve the earlier Fourth Amendment problem. But at the same time, you don't take a strict but forecausation approach. You're trying to come to some intermediate ground. And it's, as I said before, a little hard to figure out what they're getting at. But if you look at the actual factors in Brown, it seems to me to be precisely parallel to this one. Brown's first statement was separated by his legal arrest by less than two hours. Here it wasn't separated at all, right? He was still under – if there was an illegal arrest, he was still under an illegal arrest. He was still under an illegal arrest. If it wasn't illegal. Was he? He hadn't been let go or anything? So Brown's facts, as I understand them, Your Honor, is two police officers break into and hide in Brown's apartment. As he enters, they jump out and surprise him with guns. The court finds a fashion calculated to terrify him and make him incapable of pushing straight. With guns in his face, they have come there for the purpose of interrogating him. With the guns in his face and with him thus under an illegal arrest, they obtain illegal statements. Those illegal statements they then keep in reserve. They Mirandize him. After the Miranda, they get more statements out of him. The court holds that because of those initial illegal statements, the Miranda warrant didn't help because he felt he'd already confessed what was the point in trying to fight it. I think those facts are so different from these as to be incomparable. It is true that there is this statement by Carbajal that the reason why he detained Hernandez was because they wanted to see what they would find in the house. There are two things I want to point out. One is that Carbajal was not there in the morning when the defendant came by and did the lookout work, when he was seen for 45 minutes scanning up and down the street. There's no indication that Carbajal was aware of that. The other thing that I'd like to point out is that Miranda was there at the time   And the fact that he was there at the time of the incident, that doesn't make any difference from my hypothesis. Well, that might go to whether there – whether he knew where it was at all when there was probable cause at the outset. But if there wasn't probable cause at the outset, it doesn't matter. I think it does matter, because the defendant argues that basically this is like Brown where they detained him for the purpose of ginning up evidence against him. Very different, though. In Brown, they stopped him so that they could interrogate him. Here, there's absolutely no interrogation of defendant until there is – there is the Terry Stop phase where everyone concedes that there is reasonable suspicion for a Terry Stop. And then there is the post-probable cause stage where everyone basically concedes – I understand the defendant says he doesn't actually concede. But everyone concedes that after Soltero says he's the one to talk to, there's probable cause. In between those two times, no evidence is produced by virtue of having defendant detained. That is, nothing happens that – from defendant's detention that generates evidence. In Brown, the key evidence against defendant that causes the confession is obtained by the illegal arrest. It's by having the gun pointed at him, surprising him, and getting him to make the initial confession that everything else follows. Here, if you just look at what happens, it's clear that what causes the confession is the Soltero implication. It is not the fact that he was previously handcuffed and patted down. And so if you look at the four factors in – in Brown, the first and foremost one is whether there was a Miranda warning. Now, that is not sufficient alone. However, the Court says it is extremely – it's an important factor in determining whether the confession is obtained by exploitation of an illegal arrest. Here, there is no exploitation of the initial detention. Second, there's this long temporal spread. It's – you know, here the time helps us. It's seven hours. Kagan. I'm a little confused about why there's no exploitation. While he was under arrest, they went and got a search warrant, and they searched the house, and that's what generated the information that got Soltero to say what he said, so. Not so, Your Honor. Soltero said what he said because the drugs found in the garage. That was the – they didn't find anything else great in the house. If they had never searched the house – here's another way of imagining the search that didn't flow out. If instead of searching the house at all, they'd gone straight to Soltero and said, tell me about these drugs, Soltero would have said the exact same thing. They aren't my drugs. They're defendants. They would have gone and talked to defendants, and the same thing would have played out. That, in fact, could have happened during the initial Terry stop. It's just, by happenstance, the officers chose to take the first step of investigating the house before interrogating anybody. But that doesn't mean that they were exploiting the fact that they had defendant detained. Finally, on the intervening circumstances point – You're out of time, so please wrap up. Yes, Your Honor. I would say that the Nava case, as well as Manuel, is instructive. In Nava, there was no gap of time. The court basically just held in a footnote that the fact that probable cause was found in between is enough to make the subsequent statements acceptable. And finally, on flagrancy, I think the fact that probable cause is at least a very close call at the initial point shows that the initial arrest was not flagrantly illegal, even if the court were to find it was illegal. Okay. Thank you very much. Thank you, counsel, for another helpful argument. I'll give you one minute. A couple of factual sort of responses. Carbajal actually said during the suppression hearing that he would have found my client's actions suspicious, whether he would have been coming to the house or whether he decided to turn around. So I think your comment was correct. I think at that point, it wouldn't have mattered what he had done. Number two, I guess I respectfully disagree with counsel about whether food was offered. I don't know if it's a crucial fact, but I double-checked. I could find nothing in the record to show that he was offered food in that time period. Counsel may be able to show that. But what about the suggestion that they could have just had the same conversation with Sotero at the outset and it wouldn't have made a difference? Well, this is interesting. Actually, I think that point makes, actually supports my argument that the detention pending issuance of a warrant was, they were not acting with diligence. Because I did make this point. Because one of the factors in determining whether they were acting reasonably in sort of holding the suspect or freezing the premises, so to speak, while they're getting the warrant is whether they're acting diligently. I don't think they are acting diligently. Precisely one of the reasons is that counsel suggested. They could have asked Sotero that question the moment that they detained my client. Was Sotero there the whole time? Yeah, I believe so. But he was under detention the whole time? Yeah. I see. Okay. Thank you very much for your arguments. Very useful arguments. And the case of United States v. Hernandez is submitted. And we go on to United States v. Torres-Ordonez.
judges: Noonan, Berzon, Callahan